Argued and submitted June 1, 2021, affirmed March 2, petition for review denied July 28, 2022 (370 Or 198)

Patrick STONE
and Vicki Stone, as Trustees of
the Stone Family 2002 Revocable Trust,
*Plaintiffs-Respondents,*

*v.*

CCXL, LLC,
a Delaware limited liability company,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CV35870; A172815

506 P3d 1167

The parties own neighboring residential properties with a shared border, upon which a water feature extended from plaintiffs' property, over the border, and onto defendant's property. Defendant appeals from a two-part judgment in which the trial court awarded title, through adverse possession, to the land upon which the water feature sat to plaintiffs and declared that defendant's view easement across plaintiffs' property was presently unenforceable. On appeal, defendant assigns error to the trial court's conclusion that plaintiffs had established the honest belief and continuity requirements of an adverse possession claim. Defendant also assigns error to the trial court's rulings construing the view easement, arguing that the trial court erred in considering extrinsic evidence to determine the easement's purpose and erred in concluding the easement was unenforceable after weighing the parties' relative burdens. *Held*: First, the trial court did not err in determining that plaintiffs had adversely possessed the disputed area. Second, although the trial court did err in relying on extrinsic evidence to find that the purpose of the view easement was to offer a view of Mt. Hood, that error did not affect the trial court's subsequent decision, after balancing the parties' hardships, that the view easement was unenforceable under the circumstances presented.

Affirmed.

David F. Rees, Judge.

Harry B. Wilson argued the cause for appellant. Also on the briefs were Anna M. Joyce, Teresa M. Shill and Markowitz Herbold PC.

Jonathan M. Radmacher argued the cause for respondents. Also on the brief was McEwen Gisvold LLP.

Before Mooney, Presiding Judge, and Lagesen, Chief Judge, and DeVore, Senior Judge.*

DeVORE, S. J.

Affirmed.

_____
* Lagesen, C. J., *vice* DeHoog, J. pro tempore.

**DeVORE, S. J.**

The parties own neighboring residential properties with conflicting property rights. Defendant appeals from a two-part judgment that resulted from litigation underlying that property dispute. The trial court awarded title to plaintiffs, through adverse possession, to land upon which a water feature straddled the border of the parties' properties. The trial court also declared that defendant's view easement across plaintiffs' property is presently unenforceable.

We conclude that the trial court did not err in determining that plaintiffs had adversely possessed the disputed area. We determine that the trial court erred in relying on extrinsic evidence to find that the purpose of the view easement was to offer a view of Mt. Hood, but we conclude that the trial court did not err in its decision, after balancing the parties' hardships, that the view easement is presently unenforceable. We affirm.

## I.   FACTS

On appeal, we accept the trial court's findings of fact that are supported by the evidence. *Hammond v. Hammond*, 296 Or App 321, 323-34, 438 P3d 408 (2019). In the absence of an express factual finding, we will "'presume that the facts were decided in a manner consistent with the [trial court's] ultimate conclusion.'" *Agrons v. Strong*, 250 Or App 641, 655, 282 P3d 925 (2012) (quoting *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (brackets in *Agrons*)). We state the facts in accordance with that standard.

The parties own properties that share a single, long border. Plaintiffs' property is shaped like a flagpole, with the driveway following the narrower portion of the "pole" and turning slightly left before leading to the residence situated on the "flag" portion of the lot. One side of defendant's property, to the back of the residence, abuts the entire "flagpole" portion of plaintiff's property. As depicted in the following diagram, plaintiffs' property is referenced as "Tax Lot 2300," and defendant's lot is immediately to the left:



The shading indicates portions of plaintiffs' property and neighbors' properties subject to view easements described later.

When plaintiffs purchased their property in 2008, there was a landscape feature, including a rock waterfall and a pond below the waterfall, that ran alongside the driveway on the narrow flagpole portion of lot that bordered defendant's property. The input for the pond was on the other side of the driveway, where an electric pump pumped water from a stream through a culvert that ran underneath the driveway and led to the water feature on the other side. The motor that ran the pump was located in a wooden box directly above the waterfall. There was also a sitting area near the waterfall.

Defendant purchased its property in 2014 and had a survey performed to determine the physical location of the property's boundary lines. The stakes that the surveyor placed alerted plaintiffs that the water feature encroached upon defendant's property. On June 30, 2014, plaintiffs'

counsel sent a letter to defendant seeking to resolve the apparent "encroachment issue" through "some kind of lot line adjustment, exclusive easement, or irrevocable license." In July 2017, defendant's counsel sent a letter to plaintiffs summarizing that the parties had been unable to reach an agreement regarding the disputed area. Defendant also informed plaintiffs in that letter that defendant held the dominant interest of a view easement running over plaintiffs' property and that plaintiffs' property currently had "a substantial number of trees that obstruct the view easement." Defendant stated that it "intend[ed] to take immediate steps to enforce the easement."

Plaintiffs filed the complaint in this action in August 2017. In their first claim for relief, plaintiffs sought quiet title to the land with the disputed water feature and sitting areas. In their second claim for relief, plaintiffs sought a declaratory judgment that, because of changed circumstances, defendant's view easement was terminated. In the alternative, to the extent that the court found that the view easement was not terminated, plaintiffs asked the trial court to equitably balance the hardships that would result from enforcing the view easement and to declare that the easement was not presently enforceable.

At trial, two previous owners of plaintiffs' property testified about their use of the water feature. Jennifer Othus, who owned the property from April 1997 to October 2002, testified by deposition that the waterfall, pond, and pump were present when she purchased the property. She added the chairs next to the pond soon after she moved in. In a declaration, Othus testified that the pond and associated culvert required constant maintenance to avoid flooding and that she viewed it as more of "an obligation" to maintain the water feature than "a benefit." She believed that anyone who looked at the property would assume that the water feature, while close to the "very sketchy" boundary line, was part of her property.

Othus sold the property to the Wilkens in October 2002. The Wilkens sold the property to the Armstrongs on

October 7, 2004.[1] Thomas Armstrong testified that when he owned the property, he "was pretty much indifferent to [the water feature]." He "didn't have a lot of interest in it," but since it was "on [his] property," he "felt it was necessary" to "take care of it." He hired a landscaping service to maintain the area and made sure that the pump did not get clogged. Armstrong testified that no one was actively living on the property when he toured it "several months" before he purchased it. He testified that once he owned the property, he "just accepted the fact that it was on [his] property and dealt with it as [his] property ***."

The Armstrongs sold the property to plaintiffs, the Stones, in July 2008. In a declaration, Patrick Stone testified that the water feature was "obviously" and "visually" a part of the property and "so close to the driveway" that he did not question it being part of the property. Stone testified that he had hired a landscaping service to maintain the water feature area since purchasing the property, including to repair the pump when it broke, clean the water flow areas, and spread bark dust. Stone also testified that he paid the electric bill to operate the pump.

As to the view easement, Stone testified that he was aware of the 1958 view easement when he purchased the property, but he thought it had been abandoned because "the whole area is a forest." He testified that there were 13 to 15 trees subject to defendant's view easement on his property, and that complying would result in topping half of the 50- to 70-foot mature trees on his property. That would result, according to Stone, in the corresponding diminishment of the privacy and value of his property. Stone also testified that topping the identified trees would not result in the unobstructed easterly view that defendant desired, because doing so would simply offer a view into, or blocked by, the equally tall trees of other easterly neighboring properties.

Another neighbor, Frank Fristoe, whose property was east of plaintiffs' and subject to a separate, 1951 view

---

[1] There are two simultaneous deeds recorded on October 7, 2004, at 2:39:30 pm. One from the Wilkens to Hewitt Relocation Services, Inc. (Hewitt) and a second from Hewitt to the Armstrongs. Hewitt appears to be a moving relocation service hired by the Wilkens, and Hewitt's single second of ownership does not affect the adverse possession analysis.

easement, which benefitted defendant's property, testified that defendant's predecessor had terminated that view easement as applied to his property in 2013. When Fristoe realized that defendant's predecessor was preparing to sell the property, he had approached the owner to see if the family would be willing to terminate the view easement. Fristoe testified that the family supported terminating the easement because the landscaping and growth of trees on defendant's own property also blocked any view that defendant's property may have.

The trial court issued written findings of facts and conclusions of law concluding that

> "[p]laintiffs have proven by clear and convincing evidence all of the elements of adverse possession with respect to the land that contains the small waterfall area, the pump and its motor, and associated utilities and rocks necessary to make the waterfall function (cumulatively 'the Water Feature'), to the extent these permanent improvements encroach on defendant's property. It is highly probable that these improvements have existed continuously for more than ten years in their current location. The installation and maintenance of these improvements to create the Water Feature constitutes open and notorious, and exclusive and hostile possession of the property where these permanent improvements are located."

The trial court also concluded that plaintiffs proved by clear and convincing evidence that plaintiffs and their predecessors honestly believed for a continuous period of more than 10 years that the water feature was located on plaintiffs' property. The trial court, however, concluded that plaintiffs had not proved that they and their predecessors had adversely possessed the sitting area next to the water feature.

With respect to the view easement, the trial court first concluded that the purpose of the 1951 and 1958 view easements was to provide the owner of defendant's property with a view of Mt. Hood to the east. Over the years, however, the court found that those easements were generally not enforced. Based on the evidence presented and the trial court's visit to the properties, the court found that

"enforcement of the view easement would provide no value to Defendant and the purposes of the view easement have been eliminated by dense and tall trees blocking * * * the view in the properties to the east of plaintiff's property." After balancing the hardships that enforcement would respectively bring to the parties, the trial court concluded that "under current conditions, the 1958 View Easement is unenforceable against Plaintiff's property." The trial court left open the possibility that the view easement could later be enforced if there was a "material change in the tree canopy to the east of Plaintiff's property" and denied plaintiffs' request for a permanent termination of the easement.

On appeal, defendant first assigns error to the trial court's conclusion that plaintiffs had met all of the required elements to satisfy a claim of adverse possession as to the water feature. In particular, defendant argues that the trial court erred in determining that plaintiffs and each of their predecessors had the honest belief that they owned the disputed area. Defendant also argues that the trial court erred in determining that plaintiffs continuously possessed the water feature for the requisite 10 years because plaintiffs "presented no evidence that their predecessors," the Wilkens, began the vesting period by June 30, 2004, and failed to establish the requisite privity between themselves and each of their predecessors.[2]

Lastly, defendant assigns error to the trial court's rulings construing the view easement and declaring the view easement unenforceable under present circumstances. Defendant argues that the trial court erred in considering extrinsic evidence, beyond the text of the view easement, to determine that the easement's particular purpose was to provide a view of Mt. Hood. Defendant argues that the purpose of the view easement was to provide a general view "over and across" plaintiffs' property. Because that general purpose is still achievable, defendant argues that the trial court erred in declaring the view easement presently unenforceable.

---

[2] In a second assignment of error, defendant asserts that plaintiffs failed to prove the dimensions of the property adversely possessed and that the trial court erred in appointing an expert to determine a metes and bounds description of the disputed area. We reject that argument without discussion.

## II.   WATER FEATURE

A.   *Adverse Possession*

We review whether a particular set of historical facts establishes an element of adverse possession for legal error. *Wood v. Taylor*, 307 Or App 688, 700, 479 P3d 560 (2020), *rev den*, 368 Or 37 (2021).

The common law elements of adverse possession are codified by ORS 105.620, requiring that claimants show that they and their predecessors in interest have maintained actual, open, notorious, exclusive, hostile, and continuous possession of the property for a period of at least 10 years. In addition to the common law elements, the statute also requires that the claimant and their predecessors show that, at the time each entered into possession of the property, each held the honest belief that the person was the actual owner of the property. ORS 105.620(1)(b). To prove the "honest belief" element, claimants must prove by clear and convincing evidence that his or her own honest belief, and that of any necessary predecessor in interest, continued throughout the vesting period, had an objective basis, and was reasonable under the particular circumstances. ORS 105.620(1)(b)(A)-(C).

B.   *Vesting Period*

As it happens in this case, an initial question is when plaintiffs' 10-year period of adverse possession *ended*. If that fact can be determined, then the focus turns to the particular facts of the 10 years preceding. The trial court determined that, because plaintiffs saw the surveyor's stakes in 2014 and their counsel sent a letter to defendant on June 30, 2014, acknowledging the need for a solution to the encroachment upon defendant's property, plaintiffs' honest belief that the water feature was on their property extended only until that date.

Plaintiffs argue that the 10-year time period within which to evaluate the elements of adverse possession instead ends upon the filing of defendant's counterclaim, because some overt act on defendant's behalf was required to interrupt plaintiffs' belief that they had already, honestly, and adversely possessed the land.

We disagree with plaintiffs. Their argument is inconsistent with the requisite honest belief element of a statutory adverse possession claim. An honest belief of ownership "refers to a good-faith belief of actual ownership, unaccompanied by any *conscious* awareness that the land might actually belong to the neighboring landowner." *Wood*, 307 Or App at 703 (emphasis in original). The evidence in this case shows that plaintiffs had a conscious doubt as to their actual ownership of the disputed water feature area by June 30, 2014. The letter sent on plaintiffs' behalf to defendant explained that, "[u]ntil surveyors on [defendant's] property placed stakes in a manner that appeared to demonstrate that the feature was not within the bounds of [plaintiffs'] legal property line, [plaintiffs] considered the landscaped area to be theirs ***." (Emphasis omitted.) In the next paragraph of the letter, plaintiffs proposed to resolve the issue through accommodations, such as a lot line adjustment, exclusive easement, or irrevocable license. That letter shows that any historical assumption on plaintiffs' part that they actually owned the disputed area continued only "until" the surveyor's stakes appeared and was referred to in the past tense at that point. Plaintiffs therefore had a conscious awareness that the land might actually belong to defendant. Because plaintiffs would be unable to satisfy the honest belief element of an adverse possession claim after June 30, 2014, the putative 10-year vesting period would have ended on that date.

C.   *Honest Belief*

Defendant argues that plaintiffs failed to prove both that they and their predecessors had an honest belief in ownership of the water feature because the presence of the water feature alone does not provide a basis for belief in honest ownership. Defendant argues that some sort of "express conversations" between plaintiffs and their predecessors about whether they maintained or used the disputed area is necessary to provide an objective basis to support plaintiffs' honest belief that the water feature was on their property. Defendant argues that the evidence in this case is equivalent to the evidence in *Nguyen v. Conner*, 186 Or App 627, 631, 64 P3d 181 (2003), where we found the evidence to be insufficient, concluding that the existence of a fence

alone did not support the presumption that previous owners had also used the land in a manner sufficient to satisfy the elements of adverse possession.

As our cases demonstrate, every adverse possession claim depends on the particular circumstances present in each case. Defendant is correct that, in some instances, the presence of a fence alone is not sufficient to establish all of the elements of adverse possession. *Nguyen*, 186 Or App at 631. There are other instances, however, where an honest belief in actual ownership may be largely supported by the existence of a fence. *Manderscheid v. Dutton*, 193 Or App 9, 16, 88 P3d 281, *rev den*, 337 Or 247 (2004). When evaluating the sufficiency of the evidence to support an honest belief in any given adverse possession case, there are several relevant circumstances, such as the size of the property in relation to the discrepancy, the nature of the land, the experience of the parties, and what the parties had been told by their predecessors. *Wood*, 307 Or App at 706.

In this case, the evidence at trial satisfies many of the circumstances described in *Wood* and goes beyond the "mere existence" of the water feature. The nature of the land at issue includes a water feature that ran along the plaintiffs' driveway, was supplied by a culvert that ran under the plaintiffs' driveway, and abutted a portion of defendant's property that was largely unlandscaped forest. Stone, Armstrong, and Othus each testified that, as soon as they moved in, they paid to have the water feature maintained and paid for the electricity necessary to run the pump because they believed it to be on their property. Also, the few hundred square feet of disputed land that the water feature occupied was relatively small compared to the multi-acre residential properties at issue. Therefore, the record includes sufficient evidence to support the trial court's finding that each of those owners honestly believed they owned the disputed area.

To the extent defendant suggests that each owner needed to have an express conversation with the next owner in the chain of possession affirmatively confirming a belief in ownership of the water feature, such a misstatement in belief of ownership is, once again, a circumstance that may

support the existence of an honest belief in *some* cases, but is not necessary to show an honest belief in *all* cases. *Wood*, 307 Or App at 710.

Defendant also argues that the trial court erred in determining that plaintiffs had an honest belief in actual ownership because Patrick Stone had experience as an executive in the title industry, and it would be objectively impossible for him to believe he owned the property after viewing the plat map at the time of purchase. The trial court expressly found that Stone's testimony regarding his experience in the title industry did not undermine the credibility of his testimony that he reasonably believed the water feature was a part of the property he purchased in 2008. There is evidence in the record to support that finding, such as the proximity of the water feature to the driveway and Stone's testimony that his job as an executive did not involve examining titles.

On that evidence, the trial court did not err in determining that plaintiffs had an honest belief that they actually owned the disputed area when they purchased the property.

D.  *Tacking*

Defendant contends that the trial court erred in concluding that plaintiffs had satisfied the continuity element of adverse possession. To that end, defendant makes several arguments: First, generally, that each owner in the chain of possession of plaintiffs' property lacked the necessary privity with the previous owner; second, that the absence of testimony from the Wilkens defeats plaintiffs' adverse possession claim; and, third, because the deed did not include a description of the property encompassing the water feature, the Stones, in particular, did not have the requisite privity with their predecessors, the Armstrongs.

The 10-year period of possession required to satisfy an adverse possession claim can be satisfied by one possessor for the full statutory period or by a series of possessors in privity with each other under the doctrine of tacking. *Evans v. Hogue*, 296 Or 745, 755, 681 P2d 1133 (1984). Successive owners are in privity with each other if they are connected by an understanding that the rights of the possessor will be

transferred, and if a transfer of possession in fact occurs. *Id.* To create the necessary privity, the Supreme Court has explained, "it is not necessary that there should be a conveyance in writing. It is sufficient if it be shown that the prior occupant transferred his possession to him, even though by parol." *Id.* at 755 (quoting *Vance v. Wood*, 22 Or 77, 88, 29 P 73 (1892)). Thus, "[w]here the circumstances show an intent to transfer the grantor's interest in the property not included in the deed, we have recognized a transfer of the grantor's interest ***." *Id.* at 756. That is to say, the intent to transfer disputed property can be proved through circumstantial evidence. *Gilinsky v. Sether*, 187 Or App 152, 161, 66 P3d 584 (2003).

The description of the property in the deed is not determinative of the land that a seller intended to convey. *Faulconer v. Williams*, 327 Or 381, 394, 964 P2d 246 (1998). Instead, depending on the circumstances, an erroneous deed can simply represent the perpetuation of the original intent to transfer property that the parties believed to be situated within that deed's description. *Id.* Circumstantially, the behaviors and beliefs of the parties and their nature of use of the land can show that they intended to transfer the disputed property without that property being included in the deed's description. *See Gilinsky*, 187 Or App at 161 (holding that "the requisite intent to transfer the disputed property is clearly proved by the circumstantial evidence in the record"). Where an owner of the disputed property is necessary to establish the chain of ownership but is unable to testify, their intent to transfer ownership of the disputed area can also be shown through circumstantial evidence in some instances. *See Lieberfreund v. Gregory*, 206 Or App 484, 494, 136 P3d 1207 (2006) (determining that "the fact that defendants themselves believed that the curb and the wall formed the property suggests that their predecessors in interest *** held the same belief"); *Gilinsky*, 187 Or App at 157, 161-62 (relying on the testimony of an owner's daughter and neighbor where owner in chain of title was unable to testify due to his Alzheimer's disease).

In this case, Othus, who owned plaintiffs' property from 1997 to 2002 and sold the property to the Wilkens,

testified that she believed the water feature was part of the property and maintained and paid for the feature as an owner would. Armstrong, who bought the property from the Wilkens in October 2004, testified that, as soon as he moved in, he cared for the water feature in the same way, under the belief that the property encompassed it. Stone, who purchased the property from the Armstrongs in 2008 also testified that he believed the water feature to be part of the property from the first time he drove up the driveway. That evidence shows that, when each owner sold or bought the property, they believed they were either selling or buying property that included the water feature.

Although the Wilkens did not testify at trial, there is evidence that Othus believed she sold property containing the water feature to the Wilkens and evidence that Armstrong believed he bought property containing that water feature from the Wilkens two years later. Circumstantially then, there is evidence to show that the Wilkens intended to transfer ownership of the water feature to the Armstrongs. The lack of evidence of an express conversation between the Wilkens and the Armstrongs regarding the water feature is not determinative of whether there was circumstantial evidence supporting the trial court's findings.

As for the description in plaintiffs' deed that does not mention the water feature, the trial court implicitly found that the erroneous description in the deed did not reflect an intent on behalf of each owner to transfer the property *without* the water feature. As just recounted, there is evidence in the record to support that finding. Stated positively, the deed reflects the original intent of each owner to transfer property that they believed to be situated within the deed's description.

Based on that evidence, the trial court did not err in concluding that plaintiffs established the honest belief or continuity elements of their adverse possession claim.

### III.   VIEW EASEMENT

#### A.   *Two Questions*

Lastly, defendant contends that the trial court erred in deciding questions concerning the 1958 view easement.

Defendant argues that the trial court erred in determining, from extrinsic evidence, that the only purpose of the 1958 view easement was to provide defendant's property with a view of Mt. Hood. Defendant also argues that the court erred in determining, from present circumstances, that the 1958 easement was unenforceable.

As noted, defendant holds two view easements over properties to the east. The 1951 view easement, which is not at issue and is depicted by the vertical shaded lines in the diagram below, involves at least three properties and provides "an easement for unobstructed view over and across grantors' land ***." That easement granted defendant the affirmative right to enter those properties and top trees in the event that those trees grew above the described plane. The 1958 view easement, which is at issue and is depicted by the diagonal shaded lines in the diagram, was granted by plaintiffs' predecessors, the Noyes family, to defendant for "an easement for unobstructed view over and across a portion" of plaintiffs' lot. That easement also granted defendant the right to enter plaintiffs' property and top trees that encroached upon the described plane.



Defendant argues that the phrase "over and across grantors' land" is unambiguous and, therefore, the trial court erred in considering circumstantial evidence to determine that the purpose of the view easement was to provide

a view of Mt. Hood. We agree that the trial court erred in determining the view easement's particular purpose from circumstantial evidence, but, as we will explain below, that error does not undermine the trial court's separate conclusion that the 1958 view easement is unenforceable under present circumstances.

B.  *Easement's Interpretation*

We review the trial court's construction of an instrument creating an easement for legal error. *See Tipperman v. Tsiatsos*, 327 Or 539, 541, 964 P2d 1015 (1998) (reviewing the proper construction of an easement as a question of law); *Olson v. Van Horn*, 182 Or App 264, 269, 48 P3d 860, *rev den*, 334 Or 631 (2002) (determining whether an easement term was ambiguous as a question of law). When construing an easement, our fundamental task is to discern the nature and scope of the easement's purpose. *Olson*, 182 Or App at 268. The Supreme Court has explained that, in easement cases, we will only look beyond the wording of the instrument where there is an uncertainty or ambiguity. *Tipperman*, 327 Or at 544-45. A provision is ambiguous if, in context, it can reasonably be understood to have more than one meaning. *Olson*, 182 Or App at 269. Where there is an ambiguity, we will determine the intent of the original parties by examining the surrounding circumstances, such as "the purpose and nature of the easement, the circumstances existing at the time of the grant or reservation, and the manner in which the easement was used by the original parties." *Tipperman*, 327 Or at 545.

In a case involving the interpretation of an access easement, we have found that, if an easement is granted in general and unlimited terms, the parties intended the easement to include unrestricted reasonable use. *Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 245, 902 P2d 110, *adh'd to as modified on recons*, 137 Or App 312, 903 P2d 421 (1995), *rev den*, 322 Or 489 (1996). In *Criterion Interests, Inc.*, the easement provided that "'[a]ccess to waters of Deschutes River is also granted to [Hunt] over the lands of the [Deschutes Club].'" *Id.* at 245 (brackets in original). The plaintiff wanted to use the easement for recreational access to the river. *Id.* at 241. The defendant argued

that, when the easement was created, the parties intended for the easement to be used only for agricultural use. *Id.* We explained, however, that evidence of surrounding circumstances showing that the access easement was meant only for the passage of cows could not be considered:

> "[A]s we have indicated, the court may not 'insert what has been omitted or omit what has been inserted.' ORS 42.230. Evidence of the circumstances under which an agreement is made that is indicative of the parties' intent may only affect that interpretation of the agreement when there is language in the agreement that is susceptible to being construed to carry out that intent. Here, there is *no* language in the easement limiting the use for which access may be used."

*Id.* at 246 (emphasis in original).

In the context of a view easement, we have concluded that the same principle precluded consideration of surrounding circumstances demonstrating that the purpose of a view easement may have been to offer an unimpeded ocean view where the easement simply granted

> "'the right to enter upon the land and maintain the vegetation height within the area shown as 'View Easement 2' on Exhibit 'A' attached.'"

*Olson*, 182 Or App at 266. We declined to consider the surrounding circumstances in the first step of the analysis because we concluded that the language granted the right to maintain a vegetation height and nothing more. *Id.* at 270-71. The words "View Easement" did not confer ambiguity as to whether the purpose of the easement was to provide an unimpeded view or simply a view above a vegetation height. *Id.*

In this case, our inquiry concerns whether the phrase "over and across Grantors' land" in the 1958 view easement contains ambiguity so as to allow the consideration of surrounding circumstances related to the purpose of the view easement. We conclude that it does not. Similar to the access easement in *Criterion Interests, Inc.*, which provided access to the river "over" the grantor's lands, the phrase "over and across" does not specify the nature of the

view. Similar to the view easement in *Olson*, the fact that the easement was a "view easement" does not, by itself, create ambiguity as to the parties' intent or purpose behind establishing the easement. There is no language in the easement conveying why the parties thought a view "over and across" plaintiffs' land would be beneficial or limiting the instances in which the grantee would be able to enforce their view.

When interpreting the language of the view easement, the trial court erred in venturing beyond the plain language of the document to consider the surrounding circumstances such as the purpose of the related 1951 view easement and the location of the lots relative to the surrounding mountains. That error, however, did not lead the trial court to conclude that the easement should be declared terminated as plaintiffs had asked. Instead, the court concluded that the view easement would remain of record. Whether the view easement was enforceable under present circumstances was a different question, subject to a different analysis.

C.   *Easement's Enforcement*

In the alternative, plaintiffs had sought a determination that the view easement, if not terminated, was not presently enforceable. That was so, plaintiffs argued, because enforcement of the easement would result in potential hardships to plaintiffs that outweighed any potential benefit to defendant. *See Swaggerty v. Petersen*, 280 Or 739, 747, 572 P2d 1309 (1977) (explaining that, under the proper circumstances, the court will consider the relative hardship of the parties regarding the removal of an encroachment upon an easement).

Defendant argues that the trial court erred by just weighing the parties' relative hardships, because the view easement predated plaintiffs' occupancy.[3] Defendant also

---

[3] We are not persuaded by defendant's argument that equates growing trees, which predated plaintiffs' occupancy, to a servient property owner's construction of an encroaching structure, as a basis to decline weighing the parties' hardships. *See Glover v. Santangelo*, 70 Or App 689, 693-94, 690 P2d 1083 (1984) (declining to award monetary damages in place of an injunction where property owner built structure with full knowledge of covenant); *Swaggerty*, 280 Or at 748 (declining to consider burdens to property owner who himself was responsible for

argues that the trial court erred because defendant's benefit is not limited to a view of Mt. Hood; instead, the benefit is simply to see "over and across" plaintiffs' property.

Generally, the balancing of hardships—a consideration that is available in connection with the injunctive enforcement of a view easement—is an equitable matter. *See Taylor v McCollom*, 153 Or App 670, 680, 958 P2d 207 (1998) ("[I]n equitable view impairment cases, courts apply the 'relative hardship' or 'balance of hardships' test."); *see also Zerr v. Heceta Lodge No. 111*, 269 Or 174, 182-84, 523 P2d 1018 (1974) (test for enforcement by mandatory injunction). However, in this case, the trial court's balancing of hardships was not affected by the trial court's error in determining that a *particular* view was not served by the easement.

The trial court conducted an on-site review. The trial court could and did determine from all present circumstances the relative benefit to be achieved from a view from defendant's home or from defendant's property line "over and across" plaintiffs' property. The present, relative benefit would have included any obstacles from defendant's own tree cover as well as the advantages of being able to see across plaintiffs' property. Defendant has already had the opportunity to demonstrate to the trial court the advantages of the view, daylight, or sunlight that the 1958 easement offers. The defendant's benefit (to see across plaintiffs' property) and plaintiffs' hardship (topping trees) have already been considered. The trial court has determined that defendant would not experience any significant benefit from enforcing the view easement because any resulting view would be of more dense and tall trees on properties directly to the east of plaintiffs' property. That limited benefit to defendant remains negligible, regardless whether a view of Mt. Hood was deemed the easement's purpose.

For those reasons, we do not reweigh the competing hardships anew on appeal, and we perceive no benefit in asking the trial court to do again what it has already done.

---

the hardship). On these facts, we reject an approach that would preclude the need to balance hardships.

Therefore, we conclude that the trial court did not err in declaring that it would be inequitable to enforce the 1958 view easement under the circumstances.

## IV.   CONCLUSION

In sum, the trial court did not err in determining that plaintiffs had adversely possessed the disputed land, and the trial court did not err in declaring that the view easement shall remain of record but is presently unenforceable. Accordingly, we affirm.

Affirmed.